UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JOR-EL TRISTEN NORWOOD,

   Plaintiff,

 v.               Case No. 17-C-1334

CORPORAL ZACHARY BERGH,
OFFICER VETSCH, & OFFICER SULLIVAN,

   Defendants.

# DECISION AND ORDER PARTIALLY DENYING
# DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

  On September 29, 2017, Plaintiff Jor-El Tristen Norwood, who is representing himself and is currently serving a state sentence at Waupun Correctional Institution, filed this action under 42 U.S.C. § 1983. Norwood alleges that Defendants Zachary Berg, Mitch Vetsch, and Michael Sullivan, all employees of the Brown County Sheriff's Office assigned to the Brown County Jail, violated his constitutional rights while he was an inmate there. Norwood claims that the defendants used excessive force against him by placing three "spit hoods" over his head and were deliberately indifferent to his repeated reports that he was suffocating and needed medical attention. The case is before the court on the defendants' motion for summary judgment. For the following reasons, the defendants' motion will be denied as to the excessive force claim and granted as to the claim for deliberate indifference.

## BACKGROUND

  Norwood has been incarcerated at the Brown County Jail (BCJ) multiple times over the past several years. Defs.' Proposed Findings of Fact (DPFOF), ECF No. 49, at ¶ 1. The incident giving

rise to this lawsuit occurred on September 9, 2017. At that time, Norwood had been in custody at the BCJ since December 26, 2016. Pl.'s Resp. to DPFOF (PRDPFOF), ECF No. 59, at ¶ 2. Though the evidentiary record is silent on the issue, the defendants concede that Norwood was a pretrial detainee awaiting the completion of criminal proceedings at all relevant times. Defs.' Br. Supp., ECF No. 48, at 9. The defendants contend that, during the time Norwood was incarcerated in the BCJ, he frequently engaged in disruptive behavior, including yelling, threatening violence, covering his cell window, kicking his cell door, and spitting. DPFOF ¶ 3. A Corrections Emergency Response Team (CERT) intervention was often required to gain Norwood's compliance with even simple tasks, such as moving him from cell to cell. *Id.*

In the months leading up to the September 9, 2017 incident giving rise to his lawsuit, according to the defendants, Norwood engaged in the following behaviors:

- 3/14/17: Threatening to spit on officers after being secured in a restraint chair.

- 3/15/17: Threatening to fight with and spit on staff after being informed of a rules violation.

- 3/17/17: Covering his cell window, threatening self-harm, and requiring a CERT extraction when he refused to exit his cell as ordered.

- 4/2/17: Threatening to spit on and kill a health services employee when she came to evaluate his complaint of chest pain.

- 6/15/17: Refusing multiple officer orders and claiming to be suicidal when told he was receiving a rules violation as a result of his noncompliance.

- 6/15/17: Yelling at a crisis counselor and spitting at her when she attempted to evaluate him.

- 6/17/17: Refusing to remove the transfer belt as directed and then claiming to be suicidal when told he would be issued a rules violation as a result.

- 9/1/17: Disrupting medication pass by threatening staff and then claiming to be suicidal when staff informed him of his rule violation as a result of the disruptive behavior.

2

- 9/2/17: Claiming to be suicidal when he was angry about his laundry, because he "preferred being on suicide watch to potentially acting out because he is upset."

- 9/3/17: Yelling threats at staff, kicking his cell door, claiming to be suicidal, and requiring a CERT extraction when he refused to exit his cell as ordered.

*Id.* at ¶ 6.

Beginning in early September 2017, as his conduct escalated, Norwood was put on suicide watch and intermittently placed in a restraint chair in response to his repeated suicidal statements and actions, such as tying his laundry bag around his neck while arguing with BCJ staff. *Id.* at ¶ 7. At times, jail-wide operations were disrupted in order to address Norwood's behaviors. He was continually monitored by BCJ officers, medical staff, and crisis counselors to determine whether he should remain on suicide watch. *Id.* at ¶ 9.

Norwood does not dispute these facts proposed by the defendants and supported by contemporaneous incident reports. ECF No. 53-1. However, he attributes his disruptive behavior to his mental illness, paranoia, anxiety, and various other disorders he claims to suffer from. The defendants, on the other hand, view Norwood's disruptive and threatening behavior as purposeful and manipulative, intended to engineer such things as a different cell assignment. In any event, from September 5 through September 7, 2017, Norwood was being evaluated by mental health professionals for his placement in a safety cell. DPFOF ¶¶ 10–11. On September 8, Norwood was placed in a restraint chair and moved to a medical observation cell after officers observed him exhibiting self-harming behaviors in the safety cell. *Id*. at ¶ 12. Later that day, a mental health professional cleared Norwood to be moved out of the restraint chair and back into the safety cell, in an attempt to move Norwood towards less restrictive housing. *Id*. at ¶ 13. On the evening of the following day, September 9, 2017, crisis staff cleared Norwood to be moved from his safety cell

3

back to punitive segregation. *Id*. at ¶ 14. It is at that point that the events giving rise to Norwood's lawsuit arise.

Defendant Officer Michael Sullivan and non-defendant Officer Carter were assigned to transport Norwood from his safety cell to his new cell. *Id*. at ¶ 15. When officers told Norwood where he would be moved, he refused. *Id*. at ¶ 16. Officer Sullivan then radioed non-defendant Corporal Weed for assistance. *Id*. at ¶ 17. When Norwood again refused to move to his new cell, officers placed him in a restraint chair. *Id*. at ¶ 21.

While in the restraint chair, Norwood threatened to spit on officers who approached him. *Id*. at ¶ 22. Even before Norwood made his threat, the defendants were aware of Norwood's disruptive history, including his history of spitting on staff members. *Id*. at ¶ 23. Because of Norwood's history of spitting, Corporal Weed placed a spit hood on Norwood sometime after 6:05 p.m. to protect BCJ officers. *Id*. at ¶ 24. The upper half of the spit hood was made of a see-through, mesh material, which allowed air to ventilate into the hood. *Id*. at ¶ 25. The bottom half of the spit hood was a solid fabric designed to prevent the projection of bodily fluid from an individual's mouth. *Id*. at ¶ 26. The upper and lower halves are separated by an elastic band that secures the bottom half of the spit hood over the individual's mouth. *Id*. at ¶ 27. The elastic band may be secured either under the individual's nose or above the nostrils. *Id*. at ¶ 28.

At 6:45 p.m., Sullivan entered Norwood's cell to complete a safety cell check. *Id*. at ¶ 29. As he entered, he discovered that Norwood had chewed a hole through the bottom portion of the spit hood and Norwood spit through the hole, which landed approximately four to five feet from Sullivan. *Id*. at ¶¶ 30–32. Sullivan closed Norwood's cell door and notified Defendant Corporal Zachary Bergh, who was aware of Norwood's history of spitting because Norwood had once spit at him. *Id*. at ¶¶ 33, 36. Sullivan, Bergh, and Defendant Officer Mitch Vetsch determined they

4

would remove Norwood from the room to allow officers to complete mandatory checks on other inmates in the safety cells. *Id*. at ¶ 37. Because Norwood demonstrated an ability to destroy spit hoods, they also decided to place two additional spit hoods on Norwood to prevent his continued spitting. *Id*. at ¶¶ 38–39. Bergh used an inmate blanket as a shield while the officers approached and placed the blanket over Norwood's head to obstruct his vision for about five to ten seconds. *Id*. at ¶¶ 41, 44. After Sullivan and Vetsch each placed a spit hood over Norwood's head, Bergh removed the blanket. *Id*. at ¶¶ 42–43.

Norwood claims that the addition of the two spit hoods made it difficult for him to breathe. He contends that he almost suffocated and experienced dizziness and blurred vision. At one point, he felt like he was drowning in his own saliva and frantically tried to chew through the additional two spit hoods to avoid asphyxiation or suffocation. ECF No. 60 at ¶ 3. The defendants deny that Norwood experienced any difficulty breathing. They claim that jail staff members, including the defendants, monitored Norwood for any signs of physical distress or attempts to chew through the new hoods every fifteen minutes and observed no signs of respiratory distress, such as labored breathing, wheezing, choking, discoloration, or suffocation. DPFOF ¶ 45, 47.

Surprisingly, neither Norwood nor the defendants state how long the three spit hoods remained on Norwood. It appears from the defendants' supplemental responses to Norwood's Requests to Admit that the two extra spit hoods were placed on Norwood at 1900 hours. ECF No. 60-1 at 5. Officer Sullivan reports that, at 2200 hours, while Norwood was being removed from the restraint chair and placed in cell F112, he angrily complained to Lieutenant Trinkner "about having 3 spit hoods placed on him earlier and he stated he was having suicidal thoughts." *Id*. at 22. According to the report, Norwood was immediately moved from the restraint chair to the safety cell in F106 and a safety flow sheet started to document checks on his status every fifteen minutes. *Id*.

It thus appears that Norwood would have been wearing the three spit hoods at least three hours. The defendants and other BCJ staff members continued to perform safety checks on Norwood approximately every fifteen minutes until September 11, 2017. DPFOF at ¶¶ 49, 51.

On September 29, 2017, Norwood filed this federal complaint pursuant to 42 U.S.C. § 1983, alleging that the defendants used excessive force and were deliberately indifferent to his serious medical needs, in violation of his constitutional rights. ECF No. 1. On April 3, 2018, the defendants moved for summary judgment. ECF No. 47. The motion has been fully briefed and is ripe for decision.

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

**A. Excessive Force**

Norwood alleges that the defendants used excessive force by putting three spit hoods—two whole spit hoods and one spit hood with a hole chewed in it—over his head. A pretrial detainee's claim of excessive force is governed by the Due Process Clause of the Fourteenth Amendment. The "Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (citing *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)).

In *Kingsley*, the Court explained that excessive force is solely an objective, not subjective, determination. To prevail on an excessive force claim, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 2472–73. Objective reasonableness turns on the "facts and circumstances of each particular case." *Id.* at 2473. "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* In assessing the conduct of the officers, "a court must also account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (internal quotation marks and citations omitted). Finally, the following considerations are among those that may bear on the reasonableness of the force used: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.*

Defendants argue they are entitled to summary judgment on Norwood's excessive force claims because the amount of force they used (applying two additional spit hoods) was reasonable in light of Norwood's disruptive history and recent actions, including chewing through his first spit hood and spitting when Sullivan entered his safety cell. They also argue the spit hoods were needed to protect themselves and others from Norwood's propensity to spit and to allow them to do their jobs and check on the other inmates. Thus, they argue that the force they used was directly proportional to the risk Norwood posed.

Norwood, on the other hand, contends that the placement of two additional spit hoods over his head was unreasonably excessive because he was already constrained in a moveable restraint chair that allowed officers to readily move him without a struggle. Norwood also notes that the defendants could have simply used the wool blanket or their CERT protective gear to protect themselves while they moved him if they were still fearful. Norwood adds that after the two extra spit hoods were applied, he was left alone in a secured, isolated area and posed no threat to anyone else. He claims that, after the hoods were placed over his head and mouth, he felt like he was suffocating and experienced blurred vision, dizziness, and a sense that he was drowning in his saliva.

The defendants dispute Norwood's assertions and contend that they and other staff were checking on Norwood's condition every fifteen minutes. They claim that they observed no signs that Norwood was experiencing any difficulty breathing or other signs of distress. Although they admit Norwood told them he could not breathe, they contend they observed no signs of labored breathing, wheezing, choking, discoloration, suffocating, or other indications of respiratory distress. The defendants claim Norwood was breathing normally, though he remained clearly agitated and angry toward the officers. DPFOF ¶ 45–48.

These disparate versions of the effect of placing the three spit hoods over Norwood's head create an issue of fact that the court cannot resolve on a motion for summary judgment. Viewing the evidence in the light most favorable to Norwood, which I am required to do at this stage of the proceedings, a jury could find that the defendants' conduct unnecessarily caused Norwood severe discomfort and distress. Norwood's description of the panic he experienced, fearing that he was going to suffocate or drown in his own saliva, could support a jury finding that the defendants subjected him to excessive force that amounted to punishment under the circumstances. If, as Norwood claims, the defendants covered his face in this manner and kept it covered for several hours, even after he had been moved and was no longer in a position to spit on them, a jury could find that the defendants used excessive force with intent to punish him for his behavior.

To be sure, the defendants were entitled to protect themselves and others from the danger posed by Norwood's attempts to spit on guards and staff. Spitting on correctional officers and staff is not simply a way of showing disrespect. Bodily fluids like spit can carry germs and viruses that cause serious, even fatal diseases. Prison inmates, like Norwood, use spitting to assault correctional officers and staff, and correctional officers are entitled to take reasonable steps to prevent inmates from attacking them in this way and lawfully punishing them when they do. Protecting officers from such attacks is precisely what spit hoods are for.

But as the instructions for the hoods explain, they are intended to be used for only short periods of time during transport of a prisoner. The instructions for the "Tranzport Hood," which is the trade name for the spit hoods used by the BCJ, describe it as "a temporary protective hood for use on those persons where a risk of exposure to infectious disease is present." ECF No. 53-1 at 41. "If used properly," the instructions continue, "the Tranzport Hood can reduce the risk of the wearer transmitting fluids (saliva and mucous) from the facial area, as by spitting, sneezing or

9

coughing." *Id.* Under "conditions for use," the instructions caution, however, that the "wearer must be under constant supervision and should NEVER be left unattended." *Id.* There is also an explicit warning in bold capital letters at the top of the instruction sheet that reads: "WARNING: IMPROPER USE OF THE TRANZPORT HOOD MAY CAUSE INJURY OR DEATH." *Id.* The body of the instruction adds that "[i]mproper use may result in serious injury or death due to asphyxiation, suffocation or drowning in one's own fluids." *Id.*

From the evidence submitted by the parties, it appears that the defendants failed to comply with the instructions for use of the spit hoods. They used them not just to protect themselves from Norwood spitting at them during transport from one location to another, but left them on him even when he was left in the restraint chair after he was moved. They also left Norwood unattended for at least fifteen-minute periods over several hours. Although the defendants deny Norwood was experiencing respiratory distress, they admit he told them he was having trouble breathing and was clearly agitated. Norwood's claims that he thought he was suffocating and feared asphyxiation reflect the very dangers mentioned in the warnings over the possible consequences of improper use. If believed, Norwood's version of events could support a jury's finding that the defendants' conduct constituted excessive force in violation of Norwood's Fourteenth Amendment rights.

Defendants suggest that the fact that Norwood suffered no permanent injuries is further evidence that the force used was reasonable. But "[t]he absence of significant injury will not defeat a claim of excessive force." *Williams v. Stauche*, 709 F. App'x 830, 835 (7th Cir. 2017) (citations omitted). While the absence of permanent injury is a factor the court can consider, it is not dispositive. Waterboarding, for instance, allegedly results in no permanent injury, but no one would seriously argue that it would not constitute punishment if performed on an inmate by correctional officers in response to improper behavior. Placing extra spit hoods over Norwood's head in

10

response to his threats and actual spitting at guards is, of course, not the same as waterboarding. But Norwood's assertions as to the effect it had on him suggest that he experienced similar fears and distress when he was left for hours with his mouth covered by multiple spit hoods. His assertions are not so incredible, particularly given the warnings and instructions for the proper use of the hoods, that his claim can be rejected on summary judgment as a matter of law.

**B. Qualified Immunity**

Defendants argue that even if placing, and leaving, the two additional spit hoods over Norwood's head was unconstitutional, they are protected from liability under the doctrine of qualified immunity. The doctrine shields government officials from civil liability insofar as their conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and alterations omitted).

Defendants argue they are entitled to qualified immunity because there is not a case that clearly establishes that placing two additional spit hoods on an individual, who has already chewed a hole in one spit hood, violates a constitutional right. The requirement that the law governing the conduct at issue be clearly established, however, "does not go so far as to mandate a mirror-image precedent from the Supreme Court or [the Seventh Circuit]." *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866–67 (2017) (stating that the "very action in question" need not have been found to be unlawful (citation omitted)). The legal duty "need not be litigated and then established disease by disease or injury by injury." *Estate of Clark v. Walker*, 865 F.3d 544, 553 (7th Cir. 2017). A right is "sufficiently clear" if "every reasonable official would

have understood that what he is doing violates that right." *Estate of Perry v. Wenzel*, 872 F.3d 439, 460 (7th Cir. 2017) (citing *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). Additionally, some levels of force are just so plainly excessive that courts do not require an analogous case. *See Weinmann v. McClone*, 787 F.3d 444, 451 (7th Cir. 2015).

It has long been clearly established that restraining an individual maliciously and sadistically for the purpose of causing harm is a constitutional violation. *See Whitley v. Albers*, 475 U.S. 312, 321–22 (1986). The Seventh Circuit has clearly explained that "if the act involves the gratuitous infliction of pain or suffering it is deemed to be punishment, and as long as the act was intended it is a violation of the prisoner's constitutional right even if the act was not intended as punishment." *Davis v. Wessel*, 792 F.3d 793, 801 (7th Cir. 2015) (citing *Hart v. Sheahan*, 396 F.3d 887, 892 (7th Cir. 2005)). Assuming, as I must in deciding the defendants' motion, that Norwood was having difficulty breathing after the two additional spit hoods were placed over his head and that the defendants refused to remove them for as long as three hours, even though Norwood was no longer in a position to spit on anyone and was seriously distressed at the thought he was in danger of suffocation or asphyxiation, the defendants would not be entitled to good faith immunity.

## C. Deliberate Indifference

Norwood also alleged that the defendants were deliberately indifferent to his serious medical need because he was having difficulty breathing. The Constitution's ban on "cruel and unusual punishments" imposes a duty on prison officials to take reasonable measures to guarantee an inmate's safety and to ensure that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). While the Eighth Amendment's ban protects convicted prisoners, the Fourteenth Amendment protects pretrial detainees, like Norwood. To establish deliberate indifference under the Fourteenth Amendment, the plaintiff must show that (1) the "defendants

acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of" the plaintiff's medical care and that (2) the defendants' actions were objectively unreasonable. *Miranda v. Cty. of Lake*, 900 F.3d 335, 353 (7th Cir. 2018) (citing *Kingsley*, 135 S. Ct. at 2472, 2474). Under the first inquiry, negligence, or even gross negligence, is not enough. *Id.*

Under the facts alleged here, Norwood's deliberate indifference claim is included within his excessive force claim. The defendants are alleged to have intentionally subjected Norwood to excessive force by placing three spit masks over his head and ignoring his statements that he was unable to breathe as well as the distress and panic he claims he experienced. If Norwood's allegations are believed, the defendants were not merely deliberately indifferent to his distress; they caused it by their intentional conduct. There is no credible evidence that Norwood was in need of any medical attention after the hoods were removed that the defendants were either aware of or ignored. Under these circumstances, any claim for deliberate indifference is inseparable from the excessive force claim. The deliberate indifference claim will therefore be dismissed.

## CONCLUSION

Based on the foregoing analysis, Defendants' motion (ECF No. 47) is **GRANTED-IN-PART** and **DENIED-IN-PART**. Defendants' motion is denied as to Norwood's claims of excessive force. Defendants' motion is granted as to Norwood's claims of deliberate indifference and they are dismissed. Plaintiff's motion for leave to file a sur-reply (ECF No. 66) is **GRANTED**. Plaintiff has also moved for leave to file an affidavit and attached exhibit. ECF No. 74. The affidavit describes part of Plaintiff's memories of the incident. The exhibit is actually already in evidence (ECF No. 56-1). Nevertheless, for completeness of the record and because it does not

13

prejudice Defendants, Plaintiff's motion (ECF No. 74) is **GRANTED**.  The Clerk is directed to set this matter on the court's calendar for a telephone scheduling conference.

**SO ORDERED** at Green Bay, Wisconsin this  8th   day of January, 2019.

                                                    s/ William C. Griesbach
                                                    William C. Griesbach, Chief Judge
                                                    United States District Court